Filed 8/10/23  In re R.R. CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re R.R. et al., Persons Coming Under the Juvenile Court Law. | |
| SONOMA COUNTY HUMAN SERVICES DEPARTMENT, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> R.R., <br><br> Defendant and Appellant. | A167330 <br><br> (Sonoma County Super. Ct. Nos. DEP-5958-02, DEP-6041-02) |

R.R. (father) appeals from orders terminating his parental rights to now five-year-old R.R. and three-year-old G.R. (minors) and adopting a permanent plan of adoption.  He asserts the juvenile court erred by declining to find the beneficial parent-child exception applicable and that the orders should be reversed for a more appropriate permanent plan.

We affirm.

**BACKGROUND**

*Proceedings Before Welfare and Institutions Code Section 366.26 Hearing*

In May 2019, the Sonoma County Human Services Department (Department) received a referral that mother, who was pregnant at the time, was "suffer[ing] a drug-induced psychosis and attempted to jump off the

1

apartment balcony." Mother agreed to a voluntary family maintenance plan. Father, however, refused to participate in these services despite struggling "with his own mental illness and possible substance abuse" issues.

Although R.R. was initially placed with maternal grandmother, the child was later detained after grandmother was "unable to guarantee the child's safety." Four months later, the Department returned R.R. to father as the primary caretaker and both parents were offered maintenance services.

By that point, mother had given birth to G.R. Initially, the Department placed G.R. with paternal great grandmother, but after father "demonstrated positive steps to mitigate safety issues," G.R. was also placed with father as the primary caregiver and maintenance services continued.

In February 2020, the Department filed supplemental petitions as to the minors. After the juvenile court sustained allegations that father was using controlled substances and failing to provide adequate care and supervision for minors placing them at substantial risk, the court took jurisdiction of then one-year old R.R. and three-month old G.R. and removed them from father's care.

At the disposition hearing, the court adopted the Department's recommendations of reunification services for father and visitation.

Over the next 18 months, the Department recommended terminating services to father at the six-month review hearing, continuing services at the 12-month review hearing, and terminating services at the 18-month review hearing.

Prior to the 18-month review hearing, father had been doing well and the minors had been returned on "a Trial Home Visit," in advance of the hearing. However, that visit was "unsuccessfully terminated" because shortly after the minors were returned to father, he relapsed. Father initially

2

denied using, but when confronted with evidence that he had provided "fake urine in a urinary analysis," he admitted to "using methamphetamines one time." The minors were then "returned to their previous foster home."

At the 18-month review hearing, the court terminated services to mother but ordered an additional 60 days of services for father.

At the next review hearing, the court terminated father's reunification services and set the matter for a Welfare and Institutions Code section 366.26[1] hearing.

*Section 366.26 Hearing*

In its section 366.26 report, the Department recommended termination of father's parental rights and making adoption the permanent plan.

The Department provided a detailed account of visitation: Father had visited consistently with minors, except for periods of time when he "was testing positive for methamphetamines." Initially, visits were via Zoom due to the pandemic, but both father and minors had trouble "engaging and staying connected via Zoom" and visits transitioned to in-person. Father was eventually permitted unsupervised visitation. He then had a trial home visit, which was unsuccessfully terminated. During the review period, father had been scheduled for twice monthly in-person visitation but only "attended visits at an average of once per month." He had made the "judgment call" to cancel one visit when he relapsed and "was 'coming down' from using substances." He cancelled a subsequent visit because he was "not feeling well." On another visitation date, he got the location wrong and "missed much of the visit." Thus, while father had "had periods of increased attendance," he had "struggled with attendance." Given that inconsistent

---

[1] All further undesignated code sections are to the Welfare and Institutions Code unless otherwise indicated.

3

visitation, the minors "no longer [were] told when they are going to have a visit scheduled, so they are not confused." Additionally, the minors no longer asked for father in between visits.

The social worker had "observed [father] . . . as being loving, playful, and engaged with the boys." The Department acknowledged he "undoubtedly" loved his children, and it appeared the minors had a "positive connection" with father. However, the minors did not "have a substantial, emotional relationship that . . . would supersede the benefits of trust, belonging, and stability that can be gained in an adoption."

In determining whether termination of parental rights would be detrimental, the Department took into consideration the length of time minors had spent outside of father's custody, noting R.R. had been initially detained in July 2019, and until February 2020 had been "back and forth between his parents' care and relative care," until he was placed in foster care. In May 2020, he was placed in his current home with G.R., then six months old. The minors had lived in that home until the trial visit with father, which lasted less than three weeks. They were returned to their concurrent home and remained there. This meant both minors had spent over two and a half years, and "the majority of their lives," out of father's care.

The Department also noted, "It is clear," that both minors "perceive the caregivers (who are their potential adoptive parents) as their primary caregivers, and the caregivers are meeting the boys' physical and emotional needs. The [minors] look to the caregivers when they are hungry, tired, upset, or in need of comfort." The Department concluded, although interaction between father and the minors "could have some incidental

4

benefit," "termination of parental right would not be detrimental to the minors."

Father asked for, and the juvenile court approved, a bonding study. Psychologist Dr. Gloria Speicher performed the evaluation of "Bonding & Attachment" between father and the minors. To perform the evaluation, Dr. Speicher observed the minors and father in "different combinations" and reviewed the court records, medical records, evaluations of the minors, and "pertinent observations provided by others."

R.R. was born with "sepsis . . . meningitis of E. coli complicated by seizures. These birth complications place him at high risk for . . . continued delays in speech, fine motor and self[-]help skills." He had been diagnosed with "high frequency hearing loss," and required multiple follow-up appointments to monitor "various aspects of his development including [with an] ophthalmologist, neurologist, cardiologist and developmental/behavioral specialists." When he was almost three years old, R.R. was "non-verbal" and had to begin "learning sign language to communicate his needs." He was characterized as "energetic and happy," although he "lacked 'stranger danger' and sought attention from any available adult." At the time of the evaluation, R.R. was four years old, and had problems articulating himself. Thus, Dr. Speicher had difficulty understanding him but noted "foster parents seem to have no difficulty and often interpret or repeat what he was trying to convey."

G.R. was also born "with complications due to infection." Additionally, he had been "exposed to drugs in utero," and after birth required "oxygen and antibiotics." G.R. had "great difficulties with self soothing and a very strong need to be continually held by caretakers." At the time of the evaluation,

5

G.R. was three years old. He had "some difficulties with speech," but presented as "an active, social, inquisitive child."

Since the beginning of the dependency proceedings, R.R. had "been moved six times," and both minors had been in their current placement "for a total of 29 months" minus the time they had been placed with father for the trial visit.

Dr. Speicher opined R.R. "has a strong positive emotional attachment to [father]. Their bond is borne of familiarity and the protection that father has provided. Records seem to paint a picture that portrays his father as a figure of relative stability in [R.R.'s] early life. Father's care, attention, playfulness and joy in interacting with [R.R.] has helped [R.R.] see his father as extremely important and someone who is there to focus on him and attend to his needs." Dr. Speicher thought R.R. "would benefit from continuing the relationship with father."

However, continued Dr. Speicher, "Sadly, the strength of their connection to each other is not sufficient to overcome the early physical and emotional traumas and create a secure attachment style for [R.R.]" R.R.'s treating physicians pointed out his birth complications "could have serious life long repercussions," which may not show up for years, and others which had "already impacted his development. Those delays and traumas have, so far, yielded an attachment style that tends toward withdrawing and avoiding interactions and experiences." R.R. had "very high needs for structure, stability, consistency and predictability to mitigate those delays," and he would be "best served by placement in a setting that he associates with the provision of these elements." Therefore, it was Dr. Speicher's opinion that R.R.'s specific needs outweighed the potential detriment of severing the positive emotional bond with father.

6

Next, Dr. Speicher opined G.R. did "not have a strong positive bond with his father," but did have a "strong bond with his foster parents, borne primarily and easily from having spent the vast majority of his life in their care.  His relationship with his father is likely to be more confusing since from [G.R.'s] perspective, he was removed from his primary (albeit foster) parents and sent to live with his father (who until that time has been viewed as someone with whom he played and visited occasionally)."  Indeed, G.R. "appeared to feel comfortable and enjoy his time with father," and "occasionally sought proximity and played with [him].  However, the foster parents reported that in June 2021, [G.R.] was very clingy after visits.  By September 2021, he was having nightmares after visits. . . .  Since June 2022, [G.R.] is more settled and less clingy."

At the section 366.26 hearing, the court heard from father and counsel.

Father testified that R.R. greeted him at visits by "running up" to him and saying, " 'Dada, Dada,' and he's really happy to see me."  Father stated the end of the visits had "gotten better since but usually he throws a fit.  The last visit, . . . [R.R.] started crying."  Father stated G.R. was "getting more, you know, on me.  He's not as bonded as [R.R.], but he comes up and says, 'Hi, Dada,' and gives me a hug sometimes."  When asked about how R.R.'s "special needs factor" into father's bond, father maintained he did not think R.R.'s "special needs . . . really affect the fact that I have that bond with my son and the bond I have between me and [R.R.] is a lot more than [G.R.]"  Further, father stated he could "ask the County to support me with any kind of extra help to understand what I don't know or what I don't know fully of [R.R.'s] special needs that I can learn to also provide those skills to my life to take care of him."

Father recounted some of his own personal history, and stated, he did not want his children to "have the same feelings" he had about his childhood. Father stated, "deep down I know for [R.R.] he knows I am his dad and he wants to be with me. [¶] And for that, he might end up growing up some type of way that's not good for him and . . . feel like maybe I abandoned him or maybe I lied to him because I know that's how I felt. And then I started feeling as if I was not accepted and I don't want him to feel that."

Counsel for the Department urged the court to terminate parental rights and to find the beneficial parental-child relationship exception inapplicable. Counsel addressed the three prongs of *Caden C.*[2] As to the first prong, the Department conceded there had been consistent visitation. As to the second prong—whether there was a "positive emotional attachment to the parent such that the continuation of that relationship would benefit the child"—counsel stated the minors were "differently situated," in that G.R. did not have the same "positive emotional attachment to father" as R.R. G.R. had "spent most of his life outside of father's care," while R.R. had spent a "significant portion of his life . . . in father's care," although he had spent more time outside of father's care than in it. Counsel conceded there was a "positive emotional attachment between father and [R.R.]" Finally, in regard to the third prong—whether termination of parental rights would be detrimental to the child—counsel asserted that as to G.R. it was "very clear that this would not be detrimental for him." And, as for R.R., while it was very clear father loved his children, R.R.'s needs and need for permanency and stability outweighed any detriment to termination of parental rights.

Minors' counsel agreed with the Department, stating. "I think the detriment is the main issue here." R.R. "has special needs. He has

---

[2] *In re Caden C.* (2021) 11 Cal.5th 614 (*Caden C.*).

developmental delays. He has speech therapy. Occupational therapy. Developmental therapy. All of these continue to be issues with him and likely will be in the future. [¶] . . . [¶] And while there may be a relationship between [R.R.] and dad, it is not such, so substantial as it would be detrimental to sever that relationship due to the child's need."

Father's counsel argued it was "very clear father meets the first prong of [*Caden C.*] consistent visitation and at the very least for—my client believes for both children he meets the substantial positive relationship." Counsel pointed out Dr. Speicher's evaluation had concluded there was at "least for [R.R.], . . . there's in fact a strong bond." Regarding G.R., counsel disagreed with Dr. Speicher's conclusion, arguing "we do believe because of the nature of the boys' relationship with each other and their visits with dad, that there is a strong positive connection." As for the third prong, counsel asserted the bond between the minors, and especially R.R. outweighed the benefits of adoption, despite Dr. Speicher's conclusion to the contrary. Counsel maintained, "The detriment that [R.R.] would suffer by being severed from again a parent that he has a strong bond to and one of two things that obviously Dr. Speicher focused on was [R.R.'s] needs." But, continued counsel, "my client would like the Court to consider the fact . . . continuing [father and R.R.'s] relationship, would provide [R.R.] with a connection to someone who has had not only similar experiences, but maybe has some similar needs." Finally, counsel urged the court to not terminate father's rights and to adopt a permanent plan of legal guardianship.

The court began by acknowledging the many obstacles father had overcome and the progress he had made. But, while "a heartbreaking situation," the court had given father "every good opportunity and extended services as long as could be extended to try to make this work."

9

The court agreed father had been "consistent with visitation with the children and the visits are positive." The court, referring to "the very detailed" bonding study, also concluded "there's definitely a benefit to having a relationship with dad. There's no question about that."

As to the detriment element, the court began by observing that the bonding study, "which is 45-pages, very detailed document, says that the benefit does not outweigh the benefit that would be gained through the permanency of adoption." The court then reviewed the bases for that determination, including R.R.'s "high needs" and the many doctor appointments, programming and therapy he needed; the trial visit which ended unsuccessfully "due to a relapse"; that both minors were "happy and comfortable in their home," and G.R. in particular was "strongly attached to the caregivers"; the length of time the minors had spent outside of father's custody; that "[b]oth boys look to the caregivers for their needs to be met, emotionally, physically and for comfort"; the social worker's opinion that both minors were "comfortable, secure and happy in the concurrent home"; the social worker's opinion that termination of parental rights would not be detrimental; and the minors' need for permanency.

The court found the minors to be adoptable and terminated father's parental rights.

### DISCUSSION

"At the section 366.26 hearing, the question before the court is decidedly not whether the parent may resume custody of the child." (*Caden C., supra*, 11 Cal.5th at p. 630.) Instead, the purpose of a section 366.26 hearing, is to select and implement a permanent plan for the child. (*Caden C.,* at p. 630.) "[T]he court must first determine by clear and convincing evidence whether the child is likely to be adopted. (See § 366.26, subd. (c)(1).)

10

If so, and if the court finds that there has been a previous determination that reunification services be terminated, then the court shall terminate parental rights to allow for adoption. [Citation.] But if the parent shows that termination would be detrimental to the child for at least one specifically enumerated reason, the court should decline to terminate parental rights and select another permanent plan. (See § 366.26, subd. (c)(1)(B)(i)–(vi), (4)(A).)" (*Caden C.*, at pp. 630–631.) One of those exceptions is the beneficial parental-child relationship exception. (*Id.* at p. 631.)

The proponent of the exception must establish, by a preponderance of the evidence three elements: "(1) regular *visitation and contact*, and (2) a *relationship*, the continuation of which would *benefit* the child such that (3) the termination of parental rights would be *detrimental* to the child." (*Caden C., supra*, 11 Cal.5th at pp. 631, 637.)

" 'The first element [of the exception]—regular visitation and contact— is straightforward. The question is just whether "parents visit consistently," taking into account "the extent permitted by court orders." ' " (*In re Katherine J.* (2022) 75 Cal.App.5th 303, 316 (*Katherine J.*), quoting *Caden C., supra*, 11 Cal.5th at p. 632.)

"The second element, in which the court must determine whether the child would benefit from continuing the relationship with her parent, is more complicated. '[T]he relationship may be shaped by a slew of factors, such as "[t]he age of the child, the portion of the child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction between parent and child, and the child's particular needs." [Citation.]' (*Caden C., supra*, 11 Cal.5th at p. 632.) '[C]ourts often consider how children feel about, interact with, look to, or talk about their parents.' (*Ibid.*) *Caden C.* instructs us that 'it is not necessary—even if it were possible—to calibrate a precise

11

"quantitative measurement of the specific amount of 'comfort, nourishment or physical care' [the parent] provided during [his or] her weekly visits." [Citation.]' (*Ibid.*) Expert opinions or bonding studies provided by psychologists who have observed and/or reviewed the parent-child relationship are often 'an important source of information about the psychological importance of the relationship for the child.' (*Id.* at pp. 632–633, fn. omitted.) Ultimately, the court's role is to decide whether the child has a ' "significant, positive, emotional relationship with [the parent.]" ' (*Id.* at p. 633.)" (*Katherine J., supra*, 75 Cal.App.5th at pp. 316–317.)

"The third and final element asks the court to ascertain whether severing parental ties—and thus 'terminating [the] parent' relationship— would be detrimental to the child. (*Caden C., supra*, 11 Cal.5th at p. 633.) 'What courts need to determine, therefore, is how the child would be affected by losing the parental relationship—in effect, what life would be like for the child in an adoptive home without the parent in the child's life.' (*Ibid.*) Because any harm caused by loss of this relationship may be significantly mitigated by the child's adoption into a stable, loving home, the court must then perform a delicate balancing act. The 'subtle, case-specific injury [that] the statute asks courts to perform [is]: does the benefit of placement in a new, adoptive home outweigh "the harm [the child] would experience from the loss of [a] significant, positive, emotional relationship with [the parent?]" ' (*Ibid.*) 'When the relationship with a parent is so important to the child that the security and stability of a new home wouldn't outweigh its loss, termination would be "detrimental to the child *due to*" the child's beneficial relationship with a parent.' (*Id.* at pp. 633–634.)" (*Katherine J., supra*, 75 Cal.App.5th at p. 317, fn. omitted.)

12

"In addition to these substantive clarifications, *Caden C.* also establishes a hybrid standard of review for the beneficial relationship exception.  The first two elements, which require the juvenile court to 'make a series of factual determinations' regarding visitation and the parent-child relationship, 'are properly reviewed for substantial evidence.' (*Caden C., supra*, 11 Cal.5th at p. 640.)  These determinations should 'be upheld if . . . supported by substantial evidence, even though substantial evidence to the contrary also exists and the trial court might have reached a difference result had it believed other evidence.' (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 228. . . .)" (*Katherine J., supra*, 75 Cal.App.5th at pp. 317–318.)

"But 'the ultimate decision—whether termination of parental rights would be detrimental to the child due to the child's relationship with his parent—is discretionary and properly reviewed for abuse of discretion.' (*Caden C., supra*, 11 Cal.5th at p. 640.)  Accordingly, we will not disturb the juvenile court's decision unless it ' " 'exceed[s] the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination.' " ' (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318. . . .)" (*Katherine J., supra*, 75 Cal.App.5th at p. 318.)

There is no dispute that the trial court concluded father carried his burden as to the first two elements.

As to the final element—whether terminating the parental relationship would be detrimental to minors—father maintains the juvenile court abused its discretion "in finding father had not established the third element, regarding the value of maintaining [R.R.'s] and [G.R.'s] relationships with father."  He contends, "Losing their relationships with father will necessarily cause trauma to the boys, particularly to [R.R.]"  To support this assertion, father points to his own testimony and portions of Dr. Speicher's report.

13

However, selectively citing to his own testimony and portions of Dr. Speicher's report does not aid him in establishing an abuse of discretion by the juvenile court. He is simply disagreeing with the court's discretionary conclusion based on *all* of the evidence before it, that terminating the parental relationship would not be detrimental to minors and adoption would greatly benefit them. This does not establish a prejudicial abuse of discretion by the court.

Father also contends, for the first time on appeal, that Dr. Speicher's evaluation was legally insufficient to support the court's decision on the third element. In his opening brief, he maintained that while Dr. Speicher acknowledged G.R. enjoyed spending time with father, she went on to inappropriately "advocate[] for the termination of parental rights on the basis of what [G.R.] would need on an ongoing basis from a parent as a day-to-day caregiver." In his closing brief, however, he went further, suggesting Dr. Speicher failed to even address the third *Caden C.* element in regard to G.R. He also claimed Dr. Speicher erroneously compared father's attributes to those of the custodial caregivers, resulting in a no-detriment finding based on a "misapplication of the law."

To the extent father is, for the first time on appeal, challenging the adequacy of the report to support a no-detriment determination as to G.R., this contention is forfeited. (See *In re Crystal J.* (1993) 12 Cal.App.4th 407, 411–412 [mother's challenge to sufficiency of assessment reports deemed waived because she did not raise issue below]; *In re Amos L.* (1981) 124 Cal.App.3d 1031, 1038 [mother's challenge to adequacy of social study deemed waived because she did not raise issue below].) And to the extent he is raising a new issue for the first time in his reply brief—that Dr. Speicher's opinion was based on an improper legal rubric leading the juvenile court to

14

misapply the law—this contention is also forfeited. (*Campos v. Anderson* (1997) 57 Cal.App.4th 784, 794, fn. 3 ["Points raised in the reply brief for the first time will not be considered, unless good reason is shown for failure to present them before."]; *Reichardt v. Hoffman* (1997) 52 Cal.App.4th 754, 766 ["We refuse to consider the issues raised by defendant in his reply brief which were not raised in his opening brief."].)

In any case, neither Dr. Speicher's analysis nor the juvenile court's no-detriment determination was legally erroneous. Father is correct that " '[w]hen [the court] weighs whether termination would be detrimental, the court is not comparing the parent's attributes as custodial caregiver relative to those of any potential adoptive parent(s).' " (*In re A.L.* (2022) 73 Cal.App.5th 1131, 1157 (*A.L.*), quoting *Caden C., supra*, 11 Cal.5th at p. 634; see *ibid.* ["section 366.26 hearing is decidedly not a contest of who would be the better custodial caregiver"].) Rather, the court must decide whether "the relationship with a parent is *so important to the child* that the security and stability of a new home wouldn't outweigh its loss," thus, making termination of parental rights " 'detrimental to the child due to' the child's beneficial relationship with a parent." (*Caden C.,* at pp. 633–634, first italics added, second italics omitted.) Dr. Speicher, thus, discussed the nature of the minors' attachment to father —evidence directly relevant to the third element assessment the court was required to make. (*A.L.,* at p. 1157 ["The strength and quality of the parent's relationship with the child, including whether that parent has a parental role, is a relevant consideration to the court's detriment finding."].)

Furthermore, in making its assessment of the third element, the juvenile court does not ignore, as father suggests, the benefits of a new home. As the court stated in *A.L.,* "the weighing function of the juvenile court in

15

addressing the third prong is founded on the juvenile court asking this question: '[D]oes the benefit of placement in a new, adoptive home outweigh "the harm [the child] would experience from the loss of [a] significant, positive, emotional relationship with [the parent?]" ' " (*A.L.*, *supra,* 73 Cal.App.5th at p. 1158, quoting *Caden C., supra,* 11 Cal.5th at p. 633.) In *A.L.,* the juvenile court properly considered evidence that "the minor had done extremely well in the 19-plus months she had been living with her prospective adoptive family," "that it was a stable and very loving home," that the "minor had made a good adjustment, and at a very early stage, the caregivers had indicated their willingness to adopt the minor," "[a]s time evolved, the minor became very close to the caregivers' goddaughter, whom the minor saw frequently," the minor "blossomed in the role of big sister in February 2020, when the caregivers undertook the care of a safely-surrendered baby," the "minor had told social workers that she was very happy living with the caregivers, whom she called ' "mommy," "mom," "dad," and "daddy," ' " and she "had also expressed to the social worker that she did not want to be moved." (*A.L.*, at p. 1158.) In short, the juvenile court *can* consider the benefits of a new home.

In this particular case, the ability of a new home to address and provide for the minors' significant physical, mental, and emotional difficulties was necessarily part of the calculus. (See *A.L., supra,* 73 Cal.App.5th at p. 1158 [relevant evidence included "opinion evidence from social worker . . . that father . . . had not been involved in the child's medical decisions or issues"].) Accordingly, Dr. Speicher's discussion of these issues did not render her report legally deficient.

Finally, the record makes clear that the juvenile court was fully aware of its responsibility under *Caden C.*  It is also clear, the court considered all

16

the evidence before it, which included not only Dr. Speicher's report, but also the Department's reports, the entire case file, which the court took judicial notice of, and father's testimony.  Thus, while father urges that the court based its decision upon grounds identified in *Caden C.* as improper, the record does not support that conclusion.  " ' "We must indulge in every presumption to uphold a judgment, and it is [appellant's] burden on appeal to affirmatively demonstrate error—it will not be presumed." ' " (*A.L., supra,* 73 Cal.App.5th at p. 1161, quoting *People v. Tang* (1997) 54 Cal.App.4th 669, 677.)  Father has not demonstrated error, and it will not be presumed here.

While it is apparent father made significant efforts to reunify with his children, it is clear the juvenile court did not abuse its discretion in concluding he did not establish the third prong of the parental-benefit exception.  The court, after weighing the benefits to the minors in receiving a permanent adoptive home against any detriment to the children resulting from the termination of the parental relationship, properly found father had not shown that the minors' relationship to them was " 'so important to the child[ren] that the security and stability of a new home wouldn't outweigh its loss.' " (*A.L., supra,* 73 Cal.App.5th at p. 1161, quoting *Caden C., supra,* 11 Cal.5th at pp. 633–634.)

## DISPOSITION

The juvenile court orders are AFFIRMED.

_____
Banke, J.

We concur:

_____
Humes, P.J.

_____
Margulies, J.

A167330, In re RR